AO 106 (Rev. 04/10)  Application for a Search Warrant

**FILED**
UNITED STATES DISTRICT COURT
ALBUQUERQUE, NEW MEXICO

# UNITED STATES DISTRICT COURT

for the

District of New Mexico

DEC 0 7 2015

**MATTHEW J. DYKMAN**
CLERK

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>2620 Katrina Drive SW, Albuquerque, NM 87121 | )<br>)<br>)<br>)<br>)<br>) |

Case No. 15mr812

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*
See Attachment C

located in the _____ District of _____ **New Mexico** _____ , there is now concealed *(identify the person or describe the property to be seized):*
See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☑ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| Title 21 841(a)(1) and 846<br>Title 18 924(c) | Possession with Intent to Distribute and Conspiracy.<br>use or Carrying a firearm During Drug Trafficking |

The application is based on these facts:
See Attached Affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Julie Olmsted*
*Applicant's signature*

Julie Olmsted, Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 12/7/15

*Judge's signature*

City and state: Albuquerque, NM

United States Magistrate Judge Steven C. Yarbrough
*Printed name and title*

No knock warrant authorized.
Scy

## AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT

I, Julie A. Olmsted, being duly sworn, depose and state as follows:

### INTRODUCTION

1.      I am a Special Agent of the Drug Enforcement Administration (DEA), United States

Department of Justice. I have been a Special Agent since January 2012 and I am currently

assigned to the Albuquerque District Office. My experience as a Special Agent includes, but is

not limited to, conducting surveillance, interviewing witnesses, debriefing defendants, writing

affidavits for and executing search warrants, and working with undercover agents and

informants. I have received training in and have experience in the investigation of violations of

the federal drug and money laundering laws, including the offenses listed below. I have

participated in the investigation of numerous drug trafficking conspiracies, including several

Title III investigations. As a result, I am, and agents assisting in this investigation, are familiar

with matters including, but not limited to, the means and methods used by persons and drug

trafficking organizations ("DTOs") to purchase, transport, store, and distribute drugs and to hide

profits generated from those transactions. I also have experience in analyzing and interpreting

drug codes and cryptic dialogue used by drug traffickers. I am aware that DTOs are concerned

about the efforts law enforcement make to disrupt and dismantle their activities. I have

personally spoken with a DEA Financial Investigator relating to this investigation.

2.      I am an investigator assigned to the investigation of the Ordonez Drug Trafficking

Organization ("Ordonez DTO") that operates in and around Albuquerque, New Mexico. The

investigation of the Ordonez DTO focused on individuals that acquired, stored, prepared,

packaged, and sold methamphetamine and heroin in Albuquerque, New Mexico.

3.      I make this affidavit based upon my own personal knowledge, which is substantially

1

derived from my participation in the investigation, as well as that of fellow agents and officers who have participated in the investigation. In addition, I have developed information I believe to be reliable from additional sources including:

   a. Information provided by Task Force Officers ("TFO") and Special Agents ("SA") of the DEA, Senior Financial Investigators and other law enforcement officials ("agents"), including oral and written reports that I have received directly or indirectly from said investigators;

   b. Results of physical surveillance conducted by agents during the investigation;

   c. Information provided by reliable Source of Information ("SOI");

   d. Information provided by undercover agents;

   e. A review of telephone toll records and subscriber information;

   f. Information derived from consensually recorded conversations;

   g. Information derived from lawfully intercepted telephone conversations;

   h. A review of driver's license and automobile registration records; and

   i. Records from the National Crime Information Center ("NCIC").

4.     I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search certain premises. This affidavit is intended to show only that there is sufficient probable cause for the requested search warrant located at 2620 Katrina Drive SW, Albuquerque, New Mexico 87121 ("ORDONEZ' HOUSE") and does not set forth all of my knowledge about this matter. Additionally, agents expect that ORDONEZ' HOUSE has been used and continues to be used by Esther Ordonez, Gonzalo Montenegro-Coronel, Miguel Ordonez and Reydecel Lopez-Ordonez ("SUBJECTS").

**FEDERAL CHARGES RELEVANT TO THIS INVESTIGATION**

5.      I believe there is probable cause that the subjects involved in the Ordonez DTO, have

committed, are committing, and will continue to commit offenses involving violations of, *inter

alia*:

      a.  21 U.S.C. § 841 – Possession with intent to distribute and distribution of a
          controlled substance, namely methamphetamine and heroin;

      b.  21 U.S.C. § 843(b) – Use of a communication facility to further the commission
          of a felony controlled substance offense;

      c.  21 U.S.C. § 846 – Conspiracy to possess with intent to distribute and to distribute
          controlled substances;

      d.  21 U.S.C. § 856 – Maintaining a place for manufacture, distribution, or use of
          controlled substances;

      e.  21 U.S.C. §§ 952(a), 960(a), 963 – Conspiracy to import and importation of
          controlled substances;

      f.  18 U.S.C. § 924(c) – Possess/Carry a firearm in connection with drug trafficking
          crime;

      g.  18 U.S.C § 1957 – engaging in monetary transactions involving property derived
          from specified unlawful activity, and;

      h.  18 U.S.C. § 2 – Aiding and abetting.

### EVIDENCE SOUGHT DURING SEARCH

6.      Based on my training, experience and participation in this and in similar investigations, I

believe that individuals involved in illegal trafficking of controlled substances often conceal

evidence of their drug trafficking in their residences and businesses, or the residences of friends

or relatives, and in surrounding areas to which they have ready access such as garages, carports

and outbuildings.  They also conceal evidence in vehicles, including vehicles outside of their

residences, so that they have ready access to it and so that they can hide it from law enforcement,

including law enforcement officers executing search warrants at their residences or businesses.

Evidence also may be found in other areas to which a drug dealer has ready access, such as

3

rented storage areas and safety deposit boxes, or buried underground on their property. This evidence which is discussed in detail in the following paragraphs, including paraphernalia for weighing, packaging and distributing drugs, other contraband, records, documents, and evidence of drug transactions, proceeds from drug sales, and valuables obtained from proceeds. All such records as described in the paragraphs below can also be produced and/or stored on computers and other computer-related digital media such as a computer hard drive, external hard drives, thumb drives, secure digital cards and other types of flash memory cards, compact disks and floppy disks, personal digital assistants (PDAs), BlackBerry devices, iPhones, iPods, iPads, digital cameras and cellular telephones.

7.     Individuals involved in illegal drug trafficking of controlled substances often keep quantities of controlled substances on their person, in their residences, garages, outbuildings, storage areas, carports and yards, in their businesses, in the residences of friends or relatives, in their vehicles, in off-site storage facilities, and in other areas to which they have ready access.

8.     Individuals involved in drug dealing commonly use certain paraphernalia to package and prepare controlled substances for distribution. The paraphernalia includes, but is not limited to, packaging materials (such as plastic baggies, wrapping paper, cellophane, condoms, and film canisters) and scales to weigh controlled substances. Drug dealers commonly store these items on their person, in their residences, in their businesses, in the residences of friends or relatives, in their vehicles, and in other areas to which they have ready access.

9.     Drug traffickers often maintain records of their transactions in a manner similar to the record keeping procedures of legitimate businesses. Even after the drugs are sold, documentary records are often maintained for long periods of time, even years, to memorialize past transactions, the status of accounts receivable and accounts payable, and the names and

4

telephone numbers of suppliers, customers and co-conspirators.  These records may be maintained on paper, in the form of business and personal ledgers and diaries, calendars, memoranda, pay/owe sheets, IOUs, miscellaneous notes, money orders, customer lists and telephone address books. These records can reflect names, addresses and/or telephone numbers of associates and co-conspirators, the sale and purchase of controlled substances including precursors, customer lists and amounts of money owed to the trafficker by customers and by the trafficker to his/her suppliers.

10.     Drug traffickers often travel domestically and internationally to facilitate their trafficking. Evidence of foreign and domestic travel by persons engaged in illegal drug trafficking includes travel itineraries, airline tickets, receipts, and passports and visas and their contents.  These items are stored by drug dealers on their person or in their business, residences and surrounding garages, outbuildings, carports and yards, the residences of relatives and in cars.  Many of these items are accessible via the internet and can be downloaded and saved on the computer or other media.

11.     Drug traffickers often use storage facilities for drugs and other items related to trafficking that are at a location away from their residences and businesses.  These off-site storage facilities are often commercial storage lockers and rooms.  These locations are often used to store or hide drugs, contraband, money and other valuables.  Drug traffickers often keep documents and other items tending to show the existence of other stored drugs, contraband, money and other valuables in areas such as storage facilities.  Those documents and other items include rental agreements, receipts, keys, notes and maps specifically concerning off-site storage rooms, lockers, and safety deposit boxes.  This evidence may be found on their person or in their businesses, residences and surrounding garages, outbuildings, carports and yards, the residences of friends or relatives, and

5

cars. This type of documentation can be stored on digital media and concealed virtually anywhere.

12.     Other evidence of transportation, ordering, possession and sale of drugs can include the following:  telephone bills to show numbers called by the drug dealers (and hence potential associates), overnight mail receipts, bank statements, deposit and withdrawal slips, savings books, investment statements, loan statements, other financial institution statements, and federal and state tax returns.  The above items are stored by drug dealers on their person or in their business, residences and surrounding garages, outbuildings, carports and yards, the residences of friends or relatives, and cars.  This type of documentation can be stored on digital media and concealed virtually anywhere.

13.     Drug traffickers usually sell their product for cash.  Because large quantities of drugs can sell for thousands of dollars even at the wholesale level, dealers typically may have thousands of dollars in cash on hand both as proceeds of sales and to purchase supplies/inventory.  In addition, drug dealers often have other assets generated by their drug business, or purchased with cash earned, such as precious metals and stones, jewelry, real estate, vehicles and other valuables.

14.     Individuals involved in drug dealing often try to legitimize these profits from the sale of drugs.  To accomplish these goals, drug traffickers utilize foreign and/or domestic banking institutions and their attendant services, real estate and businesses, both real and fictitious.  They also try to secret, transfer and conceal the money by (a) placing assets in names other than their own to avoid detection while maintaining control, (b) laundering money through what appears to be a legitimate business or businesses, (c) hiding the money in their homes, safes and safety deposit boxes, and/or (d) using the money to buy assets which are difficult to trace.  This evidence is useful in a criminal prosecution, and it also is useful in identifying real and personal

property that can be seized and forfeited by the government under existing laws.  Documentation concerning this type of activity can be stored on digital media and concealed virtually anywhere.

15.     Evidence of significant, unexplained income of drug dealers, or for the acquisition and concealment of money and assets of drug sales, can be found on banking and investment account statements, credit card account statements, canceled checks, money orders, deposit slips, check and savings books, business and personal ledgers, accounting records, safe deposit box records and keys, federal and state tax records, rental receipts, rental agreements, utility bills, overnight mail receipts, telephone bills, loan statements records reflecting ownership of real or personal property (such as deeds of trust or vehicle registration, insurance, and ownership information), vehicle and property rental records, lease and purchase agreements, and canceled mail.  These records can be maintained on paper, but also can be maintained as electronic data on computers and other digital media.  The above items are typically kept by drug dealers on their person or in their businesses, residences and surrounding garages, outbuildings, carports, and yards, the residences of friends or relatives, and cars.

16.     Drug traffickers typically use telephones, pagers, two-way radio systems, fax machines, other communication systems, many of which can be accessed and controlled by computers or otherwise be communicated with by computers, counter-surveillance devices such as police radio scanners, and related devices in their drug trafficking activities.  These items are stored by drug dealers on their person or in their businesses, residences or cars, or the residences of friends or relatives.

17.     Information stored in electronic form on all of the above devices can provide evidence of drug trafficking and the identity of associates.  For example, numbers stored in the telephones (such as Caller ID lists reflecting recently received calls, speed dial lists of names and/or

telephone numbers, and logs of outgoing and incoming calls) can provide evidence of who the drug dealer is calling, and thus the identity of potential associates. Pagers, cellular telephones and other communication devices can contain similar information. Also, logs from fax machines can be evidence of messages sent and received, and the corresponding telephone numbers of possible associates and co-conspirators.

18.    Drug traffickers often take, or cause to be taken, photographs and/or videos of themselves, their associates, their property and their drugs. They usually maintain these photographs and/or videos on their person or in their businesses, residences or cars, on computers, or in the residences of friends or relatives. Digital still and video cameras are becoming commonplace and may be used to record digital photographs or videos. Scanners may be utilized to convert older format photographs to digital format, and magnetic video can be transferred to digital format. All can be stored in computer hard drives and related digital media.

19.    Drug traffickers often maintain firearms and ammunition on their person or in their homes, businesses or cars to protect themselves and their drugs and their drug profits. They also may maintain indicia of firearms such as receipts for firearms and ammunition, boxes for firearms and ammunition, firearms cleaning supplies, and instruction manuals and other documentation for firearms and ammunition.

20.    I know that weapons (including rifles, shotguns, and handguns) are tools of the trade for drug traffickers, who often keep firearms in close proximity to themselves, and their product and proceeds, to protect them from other drug traffickers and law enforcement.

21.    Drug traffickers often conceal evidence of drug dealing in vehicles outside of their residences for ready access and to prevent detection and seizure by officers executing search warrants at their residences. This evidence, which is discussed in detail in the preceding

8

paragraphs, includes controlled substances, indicia such as packing documents and electronic

storage devices (and their contents,) evidence tending to show the distribution of drugs (such as

IOUs, pay-owe sheets, ledgers, lists of names and numbers, telephone address books, etc.),

digital pagers (and their contents) cellular/mobile telephones (and their contents), and counter-

surveillance devices.

22.     Documents showing who owns, occupies or controls the location being searched also

show who is responsible for the items found on the premises, including contraband and other

evidence seized.  Documents and items showing the identity of the persons owning, residing in

or controlling the area being searched include, but are not limited to, utility and telephone bills,

canceled envelopes and correspondence, outgoing answering machine messages, tax returns,

keys, deeds and mortgage receipts.  These documents may also be produced on computers,

downloaded from online accounts or scanned into digital format and stored on computers and

related digital media.

23.     A list of items agents seek authority to seize is in Attachment B.

## BACKGROUND OF INVESTIGATION

24.     From May 2014 to February 2015 and beyond, DEA agents investigated a

methamphetamine source of supply ("SOS") operating in Mexico.  Agents learned that this SOS'

name is Guillermo Rivas-Recendiz, and that he also goes by the nickname "Junior" ("Junior").

An undercover agent ("UC") has been able to contact Junior directly by way of informant and

through Junior's Albuquerque's contacts.  Throughout the investigation, the UC has been able to

make bulk methamphetamine purchases at Junior's direction, and obtain methamphetamine from

and make payments to Junior's Albuquerque connections, including some of his family

members.  In August 2014, Junior placed the UC in contact with Esther Ordonez ("Esther"), who

resides at 2620 Katrina Drive SW, Albuquerque, New Mexico 87121 ("ORDONEZ' HOUSE).

Junior claimed that Esther was his aunt, though agents do not believe an actual familial

relationship exists.  The UC obtained bulk methamphetamine and made drug payments to Esther

on numerous occasions.  During a UC meeting on October 8, 2014, Esther informed the UC that

she stores illegal drugs at her house located at 2620 Katrina Drive SW, Albuquerque, New

Mexico 87121, previously referred to as ORDONEZ' HOUSE.

25.     Also during these UC heroin purchases and surveillance operations, agents identified

another suspected 'stash' house associated with the Ordonez DTO, located at 1243 Amole Vista

Street SW, Albuquerque, New Mexico 87121 ("AMOLE VISTA HOUSE").  AMOLE VISTA

HOUSE is also referenced below during the UC heroin purchases.

26.     In November 2014, the UC met Esther in order to provide Esther with a partial payment

of $1,000 towards methamphetamine previously supplied through Junior.  Prior to the meeting,

agents conducting surveillance observed Esther depart from ORDONEZ' HOUSE and travel

directly to meet the UC.  During this meeting, Esther asked the UC if the UC knew any

individuals in Santa Fe, New Mexico who wanted heroin.  The UC advised Esther that the UC

did know individuals in Santa Fe, and wanted an ounce of heroin from Esther to show to the

individuals in Santa Fe.  Esther stated she had approximately one ounce of heroin with her.  The

UC then purchased approximately 24.2 grams of heroin from Esther for $760.  Also during this

meeting, Esther stated she obtains her heroin from a 22 year old Mexican supplier from Sinaloa,

later identified as Gonzalo Montenegro-Coronel ("Gonzalo"), who is in the United States

illegally.

27.     In December 2014, agents conducted a UC purchase of approximately two ounces of

heroin from Esther.  Prior to the meeting, agents established surveillance on ORDONEZ'

10

HOUSE where they observed Esther's red Chevrolet truck depart ORDONEZ' HOUSE and arrive at the Walmart parking lot to meet with the UC. During the meeting, the UC purchased approximately 49.3 grams of heroin for $1,800 from Esther. After the meeting, agents observed Esther return back to ORDONEZ' HOUSE. Shortly afterwards, agents observed Esther's red Chevrolet truck travel to the AMOLE VISTA HOUSE and then travel to Airport Car Rental, where agents determined the occupants of the vehicle to be Esther and Miguel Ordonez ("Miguel"). After leaving the Airport Car Rental, agents observed Esther and Miguel travel to a restaurant and then return to ORDONEZ' HOUSE.

28.     On February 17, 2015, the UC purchased approximately 150 grams of heroin from Esther in Albuquerque for $4,800. Prior to the meeting, agents observed Esther's silver Saturn, depart from ORDONEZ' HOUSE and meet with the UC. After the purchase, agents observed Esther return to ORDONEZ' HOUSE.

29.     I believe during the UC purchases and the surveillance operations described above, Esther obtained heroin that was being stored at ORDONEZ' HOUSE and sold it to the UC. I also believe that when Esther returned to ORDONEZ' HOUSE, Esther then would store the illegal drug proceeds at ORDONEZ' HOUSE.

30.     On March 11, 2015, agents intereecepted wire and electronic interceptions over Esther's cellular telephone ("ORDONEZ PHONE 1"). During the period of interception over ORDONEZ PHONE 1, agents verified that Gonzalo was a SOS for heroin for Esther. Specifically, on March 19, 2015, the UC contacted Esther to request approximately eight ounces of heroin. Esther then called Reydecel Lopez-Ordonez ("Reydecel") to see if Gonzalo was available. A few minutes later, Gonzalo called Esther and stated he could help Esther with heroin and that he would meet her to provide it. During these phone calls, agents established

surveillance on ORDONEZ' HOUSE and observed the United States Marshals Service at a

residence next to ORDONEZ' HOUSE.  Esther and others mentioned the presence of law

enforcement during coinciding calls, and Esther eventually directed that Gonzalo     take the

blender that was at ORDONEZ' HOUSE to Miguel's apartment because Miguel did not have a

blender and they needed to "clean the apartment," meaning prepare heroin, to which Gonzalo

agreed.  Agents observed as Gonzalo departed from ORDONEZ' HOUSE carrying a medium

sized box which agents were able to determine to be a blender box, and departed from

ORDONEZ' HOUSE before traveling to Miguel's apartment where Esther was located.

Approximately twelve minutes later, agents observed Esther depart from Miguel's apartment and

travel directly to meet with the UC.  During the meeting, the UC purchased approximately 203.4

grams of heroin from Esther for $6,000.  After this meeting, agents observed Esther return to

Miguel's apartment and shortly after saw Gonzalo depart from Miguel's apartment and travel to

ORDONEZ' HOUSE.  Agents observed Gonzalo exit from his vehicle and remove a blender in a

box from the vehicle and proceed to ORDONEZ' HOUSE.

31.     On March 27, 2015, agents conducted another UC purchase of approximately six ounces

of heroin from Esther and her son Miguel.  During the intercepted calls over ORDONEZ

PHONE 1, Esther directed Miguel to provide the heroin to the UC.  Agents established

surveillance on Miguel at ORDONEZ' HOUSE and observed Miguel depart from ORDONEZ'

HOUSE and travel directly to the Planet Fitness parking lot where he met with the UC.  During

this meeting, the UC purchased approximately 148 grams of heroin from Miguel for $4,200.

After the meeting, agents observed Miguel return directly to ORDONEZ' HOUSE.

32.     On April 15, 2015, agents initiated court authorized wire and electronic interceptions

over Gonzalo's cellular telephone ("GONZALO PHONE 1").  During interception, agents

intercepted Gonzalo and Juan Campos ("Campos"), during which Campos asked Gonzalo for at least 100 of "la falona" (the false ones). Campos and Gonzalo agreed to meet at a location in Albuquerque, New Mexico, which agents on surveillance observed.

33. During this interception, agents intercepted phone calls between Gonzalo and his heroin SOS, known as unidentified male 77 ("UM77"), who agents believe operates from Mexico. Agents have intercepted them discussing the transportation of illegal proceeds and drugs. For example, on April 25, 2015, Gonzalo and UM77 discussed Gonzalo being ready to receive illegal drugs from UM77. The next day, UM77 advised Gonzalo to be ready for someone to pick up a "titulo" (title). Approximately ten minutes later, Gonzalo was contacted by an unidentified male (UM1083), who stated he was calling on behalf of the "del Viejo" (of the old guy). UM1083 and Gonzalo arranged a meeting location and time, which agents on surveillance were able to observe. Agents saw Gonzalo depart from ORDONEZ' HOUSE, travel to a Walmart parking lot to pick up his girlfriend and then meet with UM1083, who was driving a green Jeep Commander. After the meeting agents observed Gonzalo travel north bound on Interstate 25 north of Bernalillo, New Mexico and surveillance was terminated. During this meeting, I believe Gonzalo provided an unknown amount of illegal proceeds that were being stored at ORDONEZ' HOUSE to UM1083 on behalf of the SOS in Mexico.

34. On April 28, 2015, based on intercepted phone calls over GONZALO PHONE 1, agents determined that a drug shipment was going to be arriving in Albuquerque, New Mexico for Gonzalo. Agents learned that the individuals Gonzalo was meeting with were in a white Volkswagen Jetta. Agents observed Gonzalo depart from ORDONEZ' HOUSE on his red Yamaha Motorcycle with a black backpack. Approximately ten minutes later, Gonzalo arrived at the same location where agents located and followed the suspected white Volkswagen Jetta.

Agents positively identified the driver of the Jetta to be Luis Escapite ("Escapite") and the passenger to be Fernando Gomez-Campos ("Gomez"). Agents observed Gonzalo meet with Gomez, who was carrying a weighted plastic shopping bag which contained rectangular or oblong shaped items, near the Jetta. After the meeting, agents saw that Gomez was no longer carrying anything. Agents observed Gonzalo depart the area with the black backpack, which now looked to be weighted down, and travel directly to ORDONEZ' HOUSE. I believe during this meeting, Gomez provided a large amount of heroin to Gonzalo, who then traveled directly to ORDONEZ' HOUSE in order to store the heroin there.

35.     On May 7, 2015, agents conducted a UC purchase of approximately four ounces of heroin from Miguel and Esther in Albuquerque, New Mexico. Prior to the meeting, agents established surveillance on Miguel at Miguel's apartment, who traveled from his apartment to ORDONEZ' HOUSE. Agents also observed Gonzalo travel to a vacant lot where Gun Club Road SW ends and approximately 15 minutes later return to ORDONEZ' HOUSE. Once Miguel arrived at ORDONEZ' HOUSE, agents observed Miguel depart from ORDONEZ' HOUSE and travel directly to the UC, where the UC purchased approximately 96.8 grams of heroin from Miguel for $3,200. I believe Miguel obtained the heroin from ORDONEZ' HOUSE and provided it to the UC

36.     On May 15 and 18, 2015, similar to the events described above on April 25 and 28, 2015, agents observed Gonzalo travel directly from ORDONEZ' HOUSE and meet with the same green Jeep Commander and make an exchange with a black backpack. After the meeting, agents observed the green Jeep Commander travel to a residence in Albuquerque, New Mexico. During this meeting, I believe Gonzalo provided an unknown amount of illegal proceeds that were being stored at ORDONEZ' HOUSE and provided them to the driver of the green Jeep Commander.

14

On May 18, 2015, agents observed Gonzalo depart from ORDONEZ' HOUSE and meet with the same white Volkswagen Jetta being driven by Escapite. Agents observed Gonzalo meet with Escapite at the passenger side of the Jetta and make an exchange with Escapite, involving the same black backpack, and shortly after Gonzalo departed the area. Approximately fourteen minutes later, agents observed Gonzalo return to ORDONEZ' HOUSE while in possession of the weighted black backpack. Approximately five minutes later, agents observed Gonzalo depart ORDONEZ' HOUSE carrying the same black backpack while traveling to AMOLE VISTA HOUSE. During this meeting, I believe Escapite provided Gonzalo with an unknown amount of heroin and after the meeting Gonzalo went to ORDONEZ' HOUSE in order to store an amount of the heroin at ORDONEZ' HOUSE and then travel to AMOLE VISTA HOUSE in order to store the remaining amount of heroin.

37.      On June 1, 2015, agents intercepted wire and electronic interceptions over Gonzalo's new cellular telephone number ("GONZALO PHONE 2"). During this period of interception, on June 1, 2015, Gonzalo and Campos arranged to meet that day. Agents observed Gonzalo depart from ORDONEZ' HOUSE and meet with Campos in the area of Coors Boulevard SW and Barcelona Road SW. Agents maintained surveillance on Campos as he traveled to a nearby Albertson's grocery store and enter into the store. Agents observed Campos exit the Albertson's and enter into a maroon Chevrolet Impala driven Cayla Cillessen and travel to a residence located at in the area of 2nd St. SW and Valley High St. SW. Later that day, agents observed the maroon Chevrolet Impala travel from the area of the residence and proceed to the Albertson's to drop Campos off at his vehicle. After this meeting, Gonzalo contacted Campos and during the phone call, Gonzalo asked if Campos had made a mistake and for Campos to check because one "box" of those contained "thirty-five cans" so that would make it "seven." Gonzalo continued

and stated it was only short one because everything else was fine. During this meeting, I believe

Gonzalo provided illegal drugs that were stored at ORDONEZ' HOUSE to Campos for

distribution.

38.   On June 2, 2015, Esther contacted Gonzalo, who was using GONZALO PHONE 2.

During the phone call, Esther told Gonzalo that she was about to arrive. In the background,

Esther instructed someone to get out of her way. Gonzalo laughed and told Esther to pull out the

"shit" that Esther had behind her seat. Esther said she would pull out the "45," then changed her

mind and said she didn't want a "45" anymore and instead wanted a "38." Esther and Gonzalo

laughed and then exchanged good-byes. I believe during this conversation, Esther was frustrated

with other drivers on the road while driving to ORDONEZ' HOUSE. When Gonzalo told Esther

to pull out the "shit" behind Esther's seat, I believe Gonzalo was referring to a firearm that

Esther carries with her in her vehicle behind her seat.

39.   On June 10, 2015, the UC met with Esther in order to discuss purchasing a kilogram of

'uncut' heroin. During this meeting, Esther stated she was still in contact with the young man

from Sinaloa, Mexico, who agents know to be Gonzalo. Esther stated she could get pure heroin

for the UC and would speak with her supplier. Additionally during this meeting, Esther asked

the UC if he had spoken to "Memo." Agents know "Memo" to be another name for Junior. The

UC advised he had not and added that he did not like working with Memo. Esther stated that

Memo had asked her if she had spoken with the UC and stated she told Memo she had not heard

from the UC for quite some time. The UC asked Esther if she was still dealing with

methamphetamine and asked if she had a supplier in town other than Memo, who is believed to

reside in Mexico. Esther stated that Memo was sending a load of methamphetamine to

Albuquerque, New Mexico by Wednesday, but she had not received any updates. The UC then

asked if Esther could make a phone call to her supplier (Gonzalo), so the UC could get the information to his potential buyers. Esther then placed an outgoing call to Gonzalo, during which Esther told Gonzalo she could "rent one of the apartments but she wanted the apartment clean, clean, clean, with no cleaning agents in the carpet." Esther then stated over the phone, "like the apartments you rented to Miguel and Junior" and that the buyers would want two apartments. Agents know, based on past UC operations and UC conversations with Esther, that "apartment 16" is code for approximately 16 ounces/one pound of heroin, and "clean apartment" to therefore be code for uncut heroin. Esther stated she would be able to obtain the heroin for the UC from her source. The UC then asked if he could obtain a "sample" of the pure heroin in order to show his buyers in Colorado. Esther agreed and said she would call her source to take the sample to her at the hospital. Esther stated she would contact the UC once the heroin sample was delivered to her at the hospital.

40.     Later that day, surveillance was established at ORDONEZ' HOUSE and at the University of New Mexico Hospital, which was then Esther's whereabouts, located at 2211 Las Lomas Boulevard NE, Albuquerque, New Mexico. Agents received information over GONZALO PHONE 2, that Lopez would be delivering the sample of heroin to the hospital. Agents observed the silver Saturn depart from ORDONEZ' HOUSE and arrive at a Metro PCS dealer where agents were able to positively identify Lopez as the driver of the silver Saturn. Agents observed the silver Saturn arrive at the hospital and park in the garage. Based on surveillance footage and a sign-in sheet obtained from the hospital, Lopez did, in fact, meet with Esther inside the hospital. Shortly after, the UC and Esther were in contact with one another, and agreed to meet at the hospital. Agents observed the UC and Esther meet at the hospital and Esther provide the UC with the sample of heroin. The final meeting in order to obtain the two pounds of pure

17

heroin from Esther was conducted on July 10, 2015 and is described below.  I believe during the above surveillance operation, Reydecel obtained the heroin sample from ORDONEZ' HOUSE and provided it to Esther at the hospital.

41.     On June 15, 2015 and June 16, 2015, over GONZALO PHONE 2, Campos and Gonzalo arranged to meet in order for Gonzalo to provide the "two girls" (two pounds of heroin) and for Gonzalo not to "fuck them" (provide a cutting agent in the heroin) because Campos wanted them "cherry" (high quality).  On June 16, 2015, Gonzalo and Campos arranged to meet that day. Agents observed Gonzalo depart from ORDONEZ' HOUSE and travel to the Ricas Gorditas "Vale" restaurant and meet with Campos.  After this meeting, agents observed Campos travel to the Wal-Mart and purchase sandwich bags and heat-seal rolls.  Similar to the meeting described on June 1, 2015, agents observed Campos attempt to meet with a maroon Chevrolet Impala.  Due to Campos' discovering surveillance, Campos did not meet with the maroon Chevrolet Impala. Based on intercepted phone calls after the meeting with Gonzalo, Campos hired an attorney and supposedly gave what he had originally obtained from Gonzalo back to Gonzalo later that day. Later that night, Campos directed Gonzalo to provide the heroin that he gave back to Gonzalo to Campos' "buddy."  After the phone calls between Gonzalo and Campos, agents observed Gonzalo depart from ORDONEZ' HOUSE on his Yamaha Motorcycle and travel in the area of Coors Boulevard SW and Arenal Road SW.  Agents were unable to maintain surveillance on Gonzalo.  Approximately twelve minutes later, agents observed Gonzalo arrive back at ORDONEZ' HOUSE.  On June 22, 2015, Campos and Gonzalo have a conversation about the events that took place on June 16, 2015.  During the conversation, Campos mentioned that an old woman, who agents believe to be Cayla Cillessen, asked Campos what had happened and if it could still be done. Campos advised he did not answer the woman. When Gonzalo asked who the

old woman was, Campos said where Campos did "everything...everything." Campos reminded Gonzalo how Campos would do "it" as soon as Gonzalo gave "it" (illegal drugs) to Campos. Campos continued and said that is where he had all of the things to do that and Gonzalo acknowledged.  During this meeting, I believe Gonzalo provided approximately two pounds of heroin to Campos and Campos then directed Gonzalo to provide the two pounds of heroin to Campos' "buddy" because Campos feared law enforcement.  I also believe that Campos directed Cayla Cillessen to pick him up after meeting with Gonzalo in order for Campos to travel to her house to cut the heroin for distribution.

42.      Additionally, during this period of interception, agents intercepted Gonzalo and UM77 discussing the transportation of illegal drugs to Albuquerque, New Mexico.  On June 26, 2015, ~~using coded language,~~ ~~Gonzalo and~~ UM77 advised Gonzalo that someone who lives near Gonzalo would be contacting ~~scy~~ him in order to pick up money.  Later this same day, Gonzalo received a phone call from Ruben Pacheco-Soto ("Pacheco"), who stated he was Aron's friend. The call disconnected in the middle of the conversation. Later on, Gonzalo received an incoming call from Pacheco, who stated the "old guy" sent him. I believe Pacheco was referring to UM77, or another command figure in Mexico, who Pacheco is in contact with in order to distribute illegal proceeds and drugs. Therefore, agents conducted surveillance of Gonzalo at ORDONEZ' HOUSE and observed a black Chrysler 300, known to be used by Eduardo Munoz-Salcido ("Munoz") arrive at ORDONEZ' HOUSE, where Gonzalo entered into Munoz' vehicle. Agents observed the black Chrysler 300 arrive at AMOLE VISTA HOUSE and shortly after depart and travel to the Walmart parking lot where Gonzalo and Pacheco agreed to meet.  There, Gonzalo met with Pacheco inside Pacheco's truck before Gonzalo re-entered Munoz' Chrysler. During this meeting, I believe Gonzalo provided illegal drug proceeds stored at ORDONEZ' HOUSE to

19

Pacheco in exchange for illegal drugs.

43.      On July 9, 2015, the UC contacted Esther in order to purchase approximately six ounces
of 'cut' heroin and 16 ounces of a higher quality heroin, during which they agreed to meet the
next day.  On July 10, 2015, agents established surveillance at ORDONEZ' HOUSE.  The UC
contacted Esther and asked the UC if he wanted the six ounces in approximately one hour and
the rest (sixteen ounces of higher quality of heroin) later that day, and the UC agreed.  Shortly
after this communication with the UC, agents observed Gonzalo depart from ORDONEZ'
HOUSE in Gonzalo's black Chevrolet Camaro.  Gonzalo was followed directly to AMOLE
VISTA HOUSE.  While Gonzalo was in route to the AMOLE VISTA HOUSE, the UC received
a text message from Esther within which she advised she would meet the UC in an hour.  Shortly
after, agents observed Gonzalo's black Chevrolet Camaro depart from the AMOLE VISTA
HOUSE and travel directly to ORDONEZ' HOUSE.  Agents observed Gonzalo exit from the
black Chevrolet Camaro and enter ORDONEZ' HOUSE.  During this surveillance, I believe
Gonzalo obtained the heroin from the AMOLE VISTA HOUSE in order to prepare the heroin
ordered by the UC at ORDONEZ' HOUSE.

44.      Agents then observed Esther driving the silver Saturn and Reydecel as her passenger
while departing ORDONEZ' HOUSE.  Agents observed the silver Saturn travel directly to the
Home Depot parking lot, where Esther and the UC agreed to meet.  During this meeting, the UC
purchased approximately 156 grams of heroin from Esther and Reydecel for $4,500.  Esther told
the UC that she would have the 16 ounces of heroin later that day.  Esther added that the heroin
belonged to a "young man," who agents believe to be Gonzalo, and an "older man."  Esther then
directed the UC to contact Lopez in order to make the transaction.  Agents then observed the
silver Saturn arrive at ORDONEZ' HOUSE.

45.     The UC contacted Esther about the sixteen ounces.  Esther advised the remaining sixteen

ounces of heroin would be available later that day and both agreed to meet in the area of

Interstate 40 and 4th Street NW.  Therefore, agents again observed Esther and Reydecel enter

into the silver Saturn and depart ORDONEZ' HOUSE.  After Esther and Reydecel left

ORDONEZ' HOUSE, the UC received a phone call from Reydecel, where he advised they

would arrive in approximately ten minutes.  Agents observed the silver Saturn arrive and

repeatedly drive around the area.  Based on my training and experience, I believe this was

consistent with the occupants of the vehicle searching for law enforcement.  Agents observed the

silver Saturn arrive and park next to the UC.  Shortly after, agents observed the silver Saturn

depart from the parking lot where it arrived in the parking lot of the John Brooks Supermart

located at 3301 Coors Boulevard NW, where it remained stationary and no one exited the

vehicle.  Shortly after, agents observed the silver Saturn travel to the Precious Moments Child

Care and the silver Saturn arrive at ORDONEZ' HOUSE.  During this meeting, the UC

purchased approximately 412 grams of heroin from Esther and Reydecel for $21,500.  I believe

Esther and Reydecel obtained the heroin purchased from the UC from ORDONEZ' HOUSE and

that Esther and Reydecel then traveled to ORDONEZ' HOUSE in order to store the illegal drug

proceeds.

46.     On July 29, 2015, agents initiated court authorized wire and electronic interceptions over

a new cellular telephone used by Gonzalo ("GONZALO PHONE 3") and a cellular telephone

used by Ruben PACHECO-Soto, ("UM1505 PHONE").

47.     From September 18, 2015 to September 23, 2015, the UC negotiated with Esther to

purchase approximately ten ounces of heroin for $7,000.  The UC and Esther agreed to meet on

September 23, 2015.  On September 23, 2015, at approximately 11:40 a.m., agents established

surveillance at ORDONEZ' HOUSE and observed Gonzalo's white Mercedes Benz parked at

ORDONEZ' HOUSE.  Agents observed Gonzalo depart from ORDONEZ' HOUSE and return

approximately eleven minutes later while carrying a white bag in his left hand.  At approximately

12:05 p.m., agents observed Esther's silver Saturn arrive and park in the driveway of

ORDONEZ' HOUSE.  During this time, Esther and the UC agreed to meet in approximately

fifteen minutes.  At approximately 12:41 p.m., agents observed Esther's silver Saturn depart

from ORDONEZ' HOUSE.  Agents observed the silver Saturn travel directly to the UC vehicle,

where it arrived at approximately 12:45 p.m.  The UC exited the UC vehicle and entered into the

front passenger seat side of the silver Saturn.  During the four minute meeting, the UC obtained a

blue gift bag and entered into the UC vehicle.  Agents observed the silver Saturn depart from the

Walmart parking lot and travel directly to ORDONEZ' HOUSE.  The blue gift bag contained

approximately 260.3 grams of heroin purchased from Esther.  Agents were not intercepting wire

and electronic communications during this operation.  Therefore, agents were limited to strictly

surveillance and information from Esther.  I believe Esther brought the ten ounces of heroin from

ORDONEZ' HOUSE and provided it to the UC.

48.    On September 17, 2015, agents initiated court authorized wire and electronic

communications over two cellular telephones used by Pacheco ("UM1505 PHONE" and

"UM1505 PHONE 2"), and Pacheco's son, Ruben Bustillos-Pacheco ("Bustillos") (BUSTILLOS

PHONE 1").

### OCTOBER 7, 2015

49.    On October 7, 2015, agents intercepted a phone call between Pacheco, using UM1505

PHONE and Carlos Cervantes-Hernandez ("Cervantes").  During the call, Cervantes advised he

was calling on behalf of the "viejon" (old man) and asked Pacheco if he wanted to meet on

Fortuna at the McDonalds in Albuquerque, New Mexico. Cervantes told Pacheco he would be arriving in approximately five minutes. Pacheco told Cervantes he was not ready with the title yet and needed to call his "buddy," later to be identified as Gonzalo, to obtain the car title and Cervantes acknowledged and agreed to wait for Pacheco at the McDonalds. Pacheco then made an outgoing phone call to Gonzalo. During the conversation, Pacheco asked Gonzalo to bring the car title to Pacheco's house and Gonzalo agreed to do so.

50.     Agents established surveillance in the area of McDonalds Restaurant located in the area of Hanover Road SW, Fortuna Road NW and Coors Boulevard NW. Agents also established surveillance on Pacheco's residence.

51.     Agents located a silver Honda Civic with Texas plates at the McDonalds Restaurant, where agents positively identified Cervantes as the driver of the Honda Civic and the passenger to be later identified as Olivia Ceniceros-Favela ("Ceniceros") and two children. Agents observed the Honda Civic travel and park on 64th Street NW between Fortuna Road NW and Glenrio Road NW. Agents observed Cervantes speaking with an unidentified Hispanic male near a green Chevrolet Malibu. This green Chevrolet Malibu is the same vehicle agents have observed at ORDONEZ' HOUSE during past surveillance operations. Agents observed Cervantes return to the Honda Civic and depart the area driving south on 64th. The green Chevrolet Malibu also departed the area. Agents lost sight of the Honda Civic and Chevrolet Malibu momentarily.

52.     During this same time, agents observed Gonzalo's white Mercedes Benz arrive at 8704 Camino San Martin SW, Albuquerque, New Mexico 87121 ("PACHECO'S HOUSE") and park in the driveway. Agents observed Pacheco walk from PACHECO'S HOUSE and approach the driver side of the white Mercedes Benz speaking with the driver of the vehicle. Pacheco then

23

walked back to PACHECO'S HOUSE, out of view, and approached the passenger side of the white Mercedes Benz speaking with the occupant(s) again. Shortly after, Pacheco walked back to PACHECO'S HOUSE and the Mercedes Benz departed. At approximately the same time, Pacheco's red Chevrolet Tahoe left PACHECO'S HOUSE. During this meeting, I believe Gonzalo provided the car title to the green Chevrolet Malibu to Pacheco.

53.     Agents then located the red Chevrolet Tahoe at the McDonald's Restaurant and observed the Tahoe meet with the Honda Civic and the Chevrolet Malibu in the area of 64th Road NW and Glenrio Road NW. Agents observed Cervantes approach the passenger side of the red Chevrolet Tahoe and speak with the occupants with the passenger door remaining open. Approximately three minutes later, agents observed Cervantes enter into the green Chevrolet Malibu and Ceniceros to be the driver of the silver Honda Civic. Agents observed these two vehicles drive in tandem and proceed east on Interstate 40 to south on Interstate 25.

54.     After the meeting, at approximately the same time, Gonzalo's white Mercedes Benz and Pacheco's red Chevrolet Tahoe arrived at PACHECO'S HOUSE. Pacheco then walked from PACHECO'S HOUSE and entered in the passenger side of the white Mercedes Benz. Approximately 4 minutes later, agents observed Pacheco exit the white Mercedes Benz and remain standing at the passenger side and then proceed to PACHECO'S HOUSE shortly after. Agents observed the white Mercedes Benz depart from PACHECO'S HOUSE and arrive at ORDONEZ' HOUSE. Agents observed Gonzalo exit from the driver seat and, while carrying a black purse, enter ORDONEZ' HOUSE.

55.     During this meeting, I believe when Gonzalo provided the car title to Pacheco, Pacheco then provided that car title to Cervantes in exchange for an unknown amount of illegal drugs. After the meeting between Pacheco and Cervantes, I believe Gonzalo returned to PACHECO'S

24

HOUSE in order to obtain an unknown amount of heroin from Pacheco before traveling to
ORDONEZ' HOUSE where he would store the heroin prior to distributing them.

56.     Based on surveillance operations and intercepted phone calls over the cellular telephones
described above, I believe Esther, Gonzalo and Reydecel are residing at ORDONEZ' HOUSE.
Based on surveillance operations, undercover purchases of heroin, I believe members of the
Ordonez DTO are utilizing ORDONEZ' HOUSE in order to store illegal drugs and documents
relating to the distribution of illegal drugs in order to further their illegal drug activities. On
December 2, 2015, a Grand Jury located in Albuquerque, New Mexico issued arrest warrants for
Esther, Gonzalo and Reydecel. During the execution of the search warrant for ORDONEZ'
HOUSE agents will be arresting said defendants.

## NO KNOCK AUTHORIZATION

57.     ORDONEZ' HOUSE is surrounded by an approximately four-foot brick wall with white
iron fencing, a white iron gate at the end of the driveway and a walk-in gate. The driveway iron-
gate is closed and locked during night time hours, as seen from surveillance and pole camera
footage. Agents have observed subjects using the walk-in gate and believe the walk-in gate to be
unlocked. Additionally, agents believe that there may be approximately three (3) adults and two
(2) children living at ORDONEZ' HOUSE. Agents believe that the time it would take to make
entry through the walk-in gate, proceed to the front door, knock and announce, and breach the
business could place the entry teams in a poor tactical position, and would compromise safety for
the entry team, as well as anyone enclosed within the compound.    The additional time it would
take to knock and announce police presence, after breaching the surrounding gate, could allow
any occupants of ORDONEZ' HOUSE compound to arm themselves hide or destroy evidence,
and hide drug proceeds. For these reasons, I seek permission for a no-knock search warrant on

25

ORDONEZ' HOUSE.

## CONCLUSION

58.     Based upon the information provided in this affidavit, I believe the items, which are

described in Attachment B for each property to be searched (Attachment C), will constitute

admissible evidence of the violations outlined in this affidavit.

I swear that this information is true and correct to the best of my knowledge and belief.

JULIE A. OLMSTED
Special Agent
Drug Enforcement Administration


Subscribed and sworn to before me
This 2ⁿᵈ day of December, 2015.

Steven C. Yarbrough
United States Magistrate Judge

26

## ATTACHMENT B

## Items To Be Seized

1.  Any controlled substances enumerated in Title 21 United States Code (USC) § 812 for which possession without proper prescription, registration or authorization is illegal and in violation of § 841, except as authorized by Title 21 of the USC; including suspected heroin and methamphetamine;

2.  Books, records, receipts, notes, ledgers, designated codes and other papers relating to the transportation, ordering, purchase and distribution of controlled substances;

3.  Papers, tickets, notes, schedules, receipts, and other items relating to the SUBJECTS and others not yet identified and their co-conspirators;

4.  In any medium, including electronic medium (such as cellular telephones), books, records, receipts, bank statements and records, financial statements, insurance records, loan applications and records, wills, real estate records, money drafts, letters of credit, money orders and cashier's checks, safe deposit box keys, records and agreements, and other documents evidencing the obtaining, secreting, transfer, and/or concealment of assets and the obtaining and/or secreting currency equivalents by the SUBJECTS, and other individuals and business entities acting on their behalf;

5.  United States currency, precious metals, precious stones, jewelry, and financial instruments, including stocks and bonds;

6.  Photographs and videos, in any medium, including electronic medium (such as cellular telephones), of the SUBJECTS, assets, and/or depicting unlawful controlled substances;

7.  Notes, records, diaries, journals and papers referencing any interest the SUBJECTS may have in any business entities;

8.  Records indicating occupancy, residency, and/or ownership, dominion and/or control, of the PREMISES by the SUBJECTS, and others including, but not limited to, utility, cable, and telephone bills, cancelled envelopes, and keys;

9.  Firearms and ammunition; including but not limited to handguns, rifles, shotguns and automatic weapons;

10. Sales receipts for items evidencing the expenditure of currency and/or currency equivalents;

11. Paraphernalia for manufacturing, packaging, weighing, and distributing unlawful controlled substances, including but not limited to scales, plastic bags, plastic wrap, packing tape, electrical tape, duct tape, and vacuum-sealing equipment;

12. In any medium, including electronic medium (such as cellular telephones), documents, books and papers reflecting names, address books, addresses and/or telephone numbers pertaining to but not limited to the SUBJECTS listed above, as it relates to illegal narcotics trafficking or use of or dominion over the premises;

13. In any medium, including electronic medium (such as cellular telephones), books, records, receipts, notes, ledgers, invoices, bank records, diaries, purchase records, cash receipts and disbursements journals, inventory records and other records relating to the sales, repackaging, and redistribution of controlled substances;

14. In any medium, including electronic medium (such as cellular telephones), records, journals, promissory notes, receipts, and other documents reflecting loans and loan repayment by and between any Financial Institution and the SUBJECTS and entities listed above;  all of which are fruits, evidence and instruments of crimes against the United States Government;

15. In any medium, including electronic medium (such as cellular telephones), receipts, records, and documents depicting subscriber data and itemized telephone calls between SUBJECTS and other potential drug traffickers from the residential telephone and cellular telephones utilized or associated to the SUBJECTS, and others; including but not limited to telephone toll records for homes and/or business owned or controlled by the SUBJECTS and their associates or other telecommunications instruments used by them and/or their drug trafficking associates;

16. Any and all paging devices, cellular phones and other communication devices, bills or receipts relating to the leasing/renting of the paging devices and cellular telephones used or owned by the SUBJECTS and their associates;

17. In any medium, including electronic medium (such as cellular telephones), receipts, records, and documents indicating ownership, association, and utilization over any vehicles located at the place to be searched or elsewhere, including but not limited to titles, registration, gas receipts, repair bills and keys belong to that vehicle and/or SUBJECTS and others;

18. Other financial records which may include airline ticket receipts, credit card receipts, rental car receipts and luggage tags reflecting points of travel by SUBJECTS and their associates; and

2

19. Any and all drug customer lists, dealers lists, or any notes containing the individual names of such persons, telephone numbers and/or addresses of these customers or dealers and any corresponding records of accounts receivable, money paid or received, drugs supplied or received, or cash received to pay for controlled substances or intended to pay for controlled substances.

## ATTACHMENT C: Description of Properties and Photos

2620 Katrina Drive SW, Albuquerque, New Mexico, 87121 is a single-family dwelling constructed of wood frame and stucco. Further, the domicile in question is a singlewide trailer-home. The home is red stucco in color and is trimmed in white. The residence has a front door that faces north and is preceded by a white storm door. Access to the front door is only possible after ascending a small wooden staircase. The residence also has a detached single-car garage that faces west. Access to the driveway is possible by entering a white wrought-iron rolling security gate attached to a red stucco wall located at the north driveway. Access to the front yard and to the front door of the residence is also possible by entering a white wrought-iron gate located on the west end of the property. The front yard is surrounded by a white wrought-iron gate attached to a red stucco wall located on the west end of the property.



